# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

KITTY LOUISE HOFFMAN,            )
                                 )
        Plaintiff,            )      Civil Action No. 10-167 Erie
                                 )
        v.                    )
                                 )
MICHAEL J. ASTRUE,               )
Commissioner of Social Security, )
                                 )
        Defendant.            )

## MEMORANDUM OPINION

McLAUGHLIN, SEAN J., District Judge.

### I.    INTRODUCTION

Kitty Louise Hoffman ("Plaintiff"), commenced the instant action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner"), denying her claims for disability insurance benefits ("DIB") and supplemental security income ("SSI) under Titles II and XVI of the Social Security Act, 42 U.S.C. § 401, *et seq.* and § 1381 *et seq*. Plaintiff filed her applications on September 21, 2007, alleging disability since September 18, 2007 due to scoliosis, cerebral palsy and depression (AR 107-109;112-114; 141).[1] Her applications were denied, and she requested an administrative hearing before an administrative law judge ("ALJ") (AR 67). Following a hearing held on December 19, 2008 (AR 23-50), the ALJ concluded, in a written decision dated June 5, 2009, that Plaintiff was not entitled to a period of disability, DIB or SSI under the Act (AR 11-23). Plaintiff's request for review by the Appeals Council was denied (AR 1-6), rendering the Commissioner's decision final under 42 U.S.C. § 405(g). The instant action challenges the ALJ's decision. Presently pending before the Court are the parties' cross-motions for summary

---

[1] References to the administrative record [ECF No. 4], will be designated by the citation "(AR ___)".

1

judgment. For the reasons that follow, the Commissioner's motion will be denied and Plaintiff's motion will be granted to the extent she seeks a remand for further consideration.

## II. BACKGROUND

Plaintiff was 24 years old on the date of the ALJ's decision and has a high school education (AR 20). She has past relevant work experience as a cashier/bagger and fast food worker (AR 20; 142). Plaintiff claims disability on the basis of both physical and mental impairments.

*A. Medical evidence submitted to the ALJ*

*1. Physical impairments*

Historically, Plaintiff's treatment for her physical impairments reveal that she was diagnosed with scoliosis in the upper lumbar region and a one-half inch leg length discrepancy when she was nine years old (AR 201; 291; 437-445). Treatment consisted of a brace and/or shoe lifts, but she never required an assistive device to walk (AR 216-218; 228-229; 251; 240-257). She has also been diagnosed with mild cerebral palsy, possibly caused by a mild intrauterine stroke (AR 441).

Plaintiff was treated by various physicians at Seneca Medical Center ("Seneca") beginning in July 1994 (AR 292-311). In July 2006, Plaintiff complained of chronic back pain aggravated by heavy lifting but had no acute complaints (AR 300-302). It was noted she was "employable" and a Functional Capacity Evaluation was ordered (AR 300). She was not prescribed any medications for her back pain (AR 300).

An x-ray of Plaintiff's thoracic/lumbar spine dated September 14, 2007 showed a scoliotic curvature measuring twenty five degrees and evidence of a 10mm leg length discrepancy (AR 289). On October 4, 2007, Plaintiff was seen by Donald Smith, M.D., an orthopedic surgeon, for evaluation of her scoliosis and leg length discrepancy (AR 290). Plaintiff reported that she lost her most recent job because she did not pass the physical (AR 290). Plaintiff indicated, however, that she was of the view that her scoliosis had no bearing on her ability to perform her job and she was able to "perform her job functions to the fullest degree despite scoliosis" (AR 290). She had no complaints of back pain, although she reported slight

2

discomfort when lifting heavy boxes weighing over forty to fifty pounds (AR 290). Her physical examination was unremarkable other than an obvious curvature of her spine on forward flexion (AR 290). She was diagnosed with scoliosis with a "good" prognosis and provided a heel lift for her shoe (AR 290). When seen at Seneca on October 17, 2007, Plaintiff reported that she walked thirty minutes per day and was working with a job coach (AR 292).

On December 28, 2007, V. Rama Kumar, M.D., a state agency reviewing physician, reviewed the medical evidence of record and found that Plaintiff had medically determinable impairments of scoliosis and leg length discrepancy (AR 342). He opined that Plaintiff could occasionally lift/carry fifty pounds, frequently lift/carry twenty five pounds, could stand or walk for about six hours in an eight-hour workday, and sit for about six hours in an eight-hour workday (AR 338). In addition, Plaintiff was unlimited in her push/pull abilities and had no other limitations (AR 338-339). Dr. Kumar noted that Plaintiff claimed limitations in standing, walking, bending, pushing, pulling, climbing, balancing, stooping, kneeling, crouching and crawling (AR 342). He found her statements only partially credible however, based on reported observations of her by field office personnel, her medical history, the character of her symptoms, her daily activities, the type of treatment she received and her response to treatment (AR 342-343).

On March 10, 2008 Plaintiff reported to Kim Davis, CRNP at Seneca that she was suffering from back pain (AR 396). She indicated that she had back pain for years and could not lift more than forty pounds (AR 396). Ms. Davis reported that Plaintiff walked with a normal gait and her physical examination was unremarkable (AR 397). Plaintiff was instructed on proper lifting techniques and could engage in activity as tolerated (AR 397).

On July 24, 2008 Plaintiff to Bradley Fell, M.D., that she had "flashes of pain" down both legs every few days for six weeks that lasted for a minute or two (AR 391). On physical examination, Dr. Fell noted that she walked with a normal gait and her extremities were non-tender and normal to palpation (AR 392). Her remaining physical examination was unremarkable (AR 392). No medication was prescribed but lab tests were ordered (AR 392). Dr. Fell noted that her infantile cerebral palsy "seem[ed] mild" (AR 393).

When seen at Seneca by Veronica Santee, M.D. on November 11, 2008, Plaintiff had no musculoskeletal complaints (AR 388-390). From November 19, 2008 to December 8, 2008, Plaintiff saw a chiropractor for back pain and shoulder pain (AR 402-411). She reported that she exercised every day (AR 408).

*2. Mental impairments*

Prior to her alleged disability onset date of September 18, 2007, Plaintiff was psychologically evaluated by Martin Meyer, Ph.D and Julie Uran, Ph.D in 2003 through the Office of Vocational Rehabilitation (AR 231-239). Test results indicated that Plaintiff was of low average intelligence, and her academic abilities were below average, with deficits in the area of computations (AR 234). Dr. Meyer and Dr. Uran noted that Plaintiff was in denial of any emotional-based difficulties, although she was experiencing "phase of life issues involving autonomy as well as dependence" (AR 233). Her overall personality adjustment was considered "fair" but not disabling (AR 233). She was diagnosed with a mathematics disorder, identity problem, and mood disorder, and was assigned a global assessment of functioning[2] ("GAF") score of 60-65 (AR 234). It was recommended that Plaintiff undergo supportive and vocational counseling (AR 234).

From August 2, 2007 to December 12, 2008, Plaintiff sought counseling at Paoletta Psychological Services ("Paoletta") for her alleged mental impairments (AR 259-278; 412-432).

---

[2] The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest. The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 34 (4th ed. 2000). An individual with a GAF score of 51 to 60 may have "[m]oderate symptoms" or "moderate difficulty in social, occupational, or school functioning;" of 41 to 50 may have "[s]erious symptoms (e.g., suicidal ideation ....)" or "impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job);" of 31 to 40 may have "[s]ome impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking or mood"; of 21 to 30 may have behavior "considerably influenced by delusions or hallucinations" or "serious impairment in communication or judgment (e.g., ... suicidal preoccupation)" or "inability to function in almost all areas ...; and of 11 to 20 may have "[s]ome danger of hurting self or others ... or occasionally fails to maintain minimal personal hygiene ... or gross impairment in communication...." *Id.*

At her initial diagnostic assessment on August 2, 2007, Plaintiff complained of mood swings, depression, hair pulling (which resulted in a bald spot), insomnia and anxiety (AR 259). Plaintiff reported that she lived with her parents and nephews (AR 261). She further reported minimal pain from scoliosis which she managed with Tylenol (AR 262-263). Plaintiff stated that she wanted to get out on her own but was financially unable to do so (AR 267). She described herself as a dependable person who performed jobs to the best of her ability, and stated that her future goals were to attend school and hold down a steady job (AR 267).

On mental status examination, the examiner reported that Plaintiff was cooperative and friendly, but her mood was mildly manic and anxious (AR 268). She displayed circumstantial thought and exhibited flight of ideas, going "on and on about Batman and cars" and rapidly changed subjects (AR 268). She denied suffering from any hallucinations or delusions (AR 268). The examiner found her insight was "impaired", diagnosed her with a mood disorder not otherwise specified and trichotillomania[3] (AR 270). She was assessed with a GAF score of 40 (AR 270). At her appointment on August 16, 2007, a Paoletta therapist assessed her with a GAF score of 50, and a treatment plan was formulated to include weekly individual therapy (AR 271-278). Her criteria for discharge were to develop a consistent positive self-image and healthy cognitive patterns over a six month period and a GAF score of 65 or higher (AR 278).

When seen at Seneca on September 19, 2007, Dr. Beals noted that Plaintiff seemed stressed about her work shift and seemed "more upset than would be expected" (AR 294). On September 25, 2007, it was noted that Plaintiff was "very upset" that she failed a work physical (AR 293).

Plaintiff returned to Seneca on October 17, 2007 and complained of increased stress from living at home with her parents and two nephews, and it was noted that she was "very tearful and agitated" (AR 292). She further complained of sleep disturbances, and was assessed with mood swings and insomnia (AR 292).

---

[3] Trichotillomania is the "unnatural impulse to pull out one's own hair." *Tabor's Cyclopedic Medical Dictionary* T-71 (13th ed.).

5

Clinical Psychologist Robert P. Craig, Ph.D., performed a psychological evaluation of Plaintiff on January 28, 2008 (AR 344-355). Dr. Craig observed that she drove herself to the examination site and was easily able to ambulate to the examination room (AR 346). He found her attention, concentration, motivation and self-sufficiency were all "good" (AR 346). Dr. Craig noted that Plaintiff had no particular medical concerns, and stated that her cerebral palsy and scoliosis did not cause any problems (AR 346). While she had no problems walking, Plaintiff indicated she could only lift thirty pounds (AR 346). She stated that she walked twenty to thirty minutes per day in order to stay fit (AR 347). In addition, Plaintiff reported that she could perform all of her activities of daily living, including cooking, cleaning, childcare and handling money (AR 348). She further reported that she was able to concentrate if it was something she liked (AR 348). Plaintiff stated that she occasionally felt depressed, and was not on any medications and had never been hospitalized for any mental health problems (AR 346). Plaintiff noted that she was undergoing outpatient therapy approximately every three weeks at Paoletta Psychological Services (AR 346). She stated that she was rarely depressed but worried "a lot" and became angry once a day when she was around children (AR 347).

On mental status examination, Dr. Craig reported that Plaintiff's behavior and psychomotor activity were symptomatic of a fairly nervous individual, but were also symptomatic of an individual in pain (AR 347). Plaintiff was fully oriented, no significant impulse control problems were noted, and there were no indications of any psychotic disorders (AR 347). Dr. Craig found her thinking processes, memory and basic judgment were intact (AR 347). Dr. Craig diagnosed Plaintiff with depressive disorder not otherwise specified, in partial or full remission, found her prognosis was "good" and assigned her a GAF score of 60 (AR 190). Dr. Craig opined that Plaintiff's ability to understand, remember, and carry out instructions was not limited by Plaintiff's alleged mental impairments, nor was her ability to respond appropriately to supervision, co-workers, or work pressures (AR 167).

Plaintiff was seen at Seneca by Michael Mewes, CRNP on January 30, 2008 and complained of anxiety, but denied suffering from depression or suicidal thoughts (AR 398). On mental status examination, Mr. Mewes found Plaintiff was cooperative and her affect was

6

appropriate to her mood, but she displayed anxiety periodically during the exam (AR 398). She was assessed with, *inter alia*, a mood disorder, prescribed Fluoxetine[4] and was directed to continue counseling with Paoletta (AR 398).

On February 8, 2008, Edward Jonas, Ph.D., a state agency reviewing psychologist, reviewed the medical evidence of record and found that Plaintiff had a depressive disorder, in partial to full remission (AR 360). He concluded that Plaintiff had no restrictions in her activities of daily living, and only mild difficulties in maintaining social functioning, concentration, persistence and pace (AR 367). In rendering his opinion, Dr. Jonas assigned "great weight" and "adopted" Dr. Craig's assessment, finding that Dr. Craig's assessment of Plaintiff functional abilities was fairly consistent with the other evidence in the file (AR 369).

On March 10, 2008, Plaintiff was seen by Ms. Davis at Seneca and reported insomnia, anxiety and depression (AR 396). Plaintiff declined medication for her symptoms (AR 397). On May 1, 2008, Plaintiff was seen by Mr. Mewes and complained of insomnia, but denied any other psychological symptoms (AR 394). On mental status examination, Mr. Mewes reported that she was cooperative, her mood was normal, and she exhibited good eye contact (AR 394). She was prescribed Trazodone for her symptoms of insomnia (AR 395).

Plaintiff returned to Seneca on July 24, 2008 and was seen by Dr. Fell (AR 391-393). Dr. Fell noted that Plaintiff rambled in conversation and needed constant redirection (AR 391). She denied suffering from anxiety or depression (AR 391). On mental status examination, Dr. Fell found Plaintiff fully oriented, her mood and affect were normal, and she was attentive and able to concentrate (AR 392). Dr. Fell assessed her with a mood disorder, prescribed Trazodone, and commented that her unique personality issues may complicate her employment opportunities (AR 393).

Plaintiff was psychologically evaluated by William J. Fernan, Ph.D., on November 7, 2008 pursuant to the request of her counsel (AR 379-387). Dr. Fernan reported that Plaintiff's hygiene and grooming were good with appropriate dress and that she was cooperative, well-mannered and "self-sufficient" (AR 379). Plaintiff described a poor work record, claiming that

---

[4] Fluoxetine is also known as Prozac and is used to treat depression. *See* http://www.drugs.com/fluoxetine.html.

she had poor coworker and supervisor relationships because she became easily agitated and verbally aggressive (AR 380). She indicated that she developed anxiety and depression in 2004, causing her to pull out her hair (AR 380). Plaintiff stated that she sought treatment at Paoletta Counseling Center in late 2006 and attended off and on until September 2008 (AR 380). Plaintiff reported that her symptoms had been milder lately without the stress of working (AR 380). She reported occasional tearfulness, sleep and appetite disturbances, irritability and anxiety (AR 380).

On mental status examination, Dr. Fernan found that Plaintiff's speech was somewhat pressured, she exhibited a very flat and depressed affect with constant tearfulness, and she had difficulty answering questions in a goal-directed manner (AR 381). She had no loose associations or tangential thinking, and her abstract thinking, fund of information and test judgment were good (AR 381). Dr. Fernan found that her concentration and recent past memory were "extremely poor" and her recent memory was "poor" (AR 382). He further found that her attention and immediate memory were "severely impaired," in that she could recall five digits forward but could not accomplish two digits backwards (AR 382). He indicated she had poor impulse control, became verbally aggressive, and demonstrated very poor social judgment (AR 382).

Dr. Fernan administered the Minnesota Multiphasic Personality Inventory-2 ("MMPI") test (AR 382). Although he noted that the validity of the scores could be viewed as of "somewhat questionable validity," he nevertheless concluded that her profile pattern would be "seen as being valid" due to her strong subjective feelings of distress and her difficulty interpreting more difficult test items (AR 382). Dr. Fernan found that her personality pattern indicated she was significantly withdrawn and felt alienated, "while having significant anxiety and debilitating depression" (AR 382). He concluded that she harbored anger and resentment, "would be easily irritated" and would "behav[e] in a very immature, impulsive and aggressive manner" (AR 382).

Dr. Fernan diagnosed Plaintiff with major depressive disorder, recurrent, moderate; anxiety disorder not otherwise specified; panic disorder without agoraphobia; and a mathematics

disorder (by record) (AR 383). He assigned her a GAF score of 50 and concluded that her prognosis was "extremely poor" given the severity of her personal adjustment difficulties, which had shown a "very poor response to treatment," combined with her "apparently very significant physical problems" (AR 384). Dr. Fernan was of the view that appropriate treatment would consist of continued medication and individual psychotherapy, requiring "at least several years" (AR 384).

Dr. Fernan completed a medical source statement and opined that Plaintiff was markedly limited in her ability to carry out short, simple or detailed instructions (AR 386). In support, he indicated that her mental status examination showed she had great difficulty answering questions in a goal-directed manner and she showed poor recent memory, extremely poor recent past memory and concentration, and severely impaired attention and immediate memory (AR 385). He further opined that she was markedly limited in her ability to interact appropriately with the public, supervisors and coworkers, and extremely limited in her ability to respond appropriately to work pressures and changes in a routine work setting (AR 386). Dr. Fernan stated that the contrast between her history and her personality assessment indicated that she downplayed the severity of her personal adjustment difficulties (AR 385). He found she was significantly withdrawn and had great difficulty refraining from focusing on her physical problems (AR 385). Dr. Fernan indicated that she would experience an exacerbation of her somatic difficulties with stress, which would be difficult to control (AR 385).

Plaintiff returned to Seneca on November 18, 2008 and was seen by Dr. Santee (AR 388-390). She complained of insomnia and increased stress due to family issues and a lack of transportation, but stated that she was dealing with her stress by playing the guitar (AR 388). Plaintiff denied any other psychological symptoms (AR 388). Dr. Santee noted that Plaintiff's insomnia was exacerbated by the recent time change, and made no changes to her Trazodone dosage (AR 389). Dr. Santee further noted that Plaintiff saw a counselor irregularly for her mood disorder, but appeared to be doing well (AR 389).

Treatment records from Paoletta dated December 2, 2008 show that Plaintiff attended twenty out of twenty-six scheduled monthly counseling appointments (AR 413). Her diagnosis

9

was depressive disorder, not otherwise specified and trichotillomania (AR 413). She was assessed a GAF score of 50, but no medications were prescribed (AR 413). Her discharge criteria was amended to reflect that she would be discharged upon achieving treatment goals and a GAF score of 70 or higher (AR 419).

On December 16, 2008, Dr. Fell opined that Plaintiff was permanently disabled from any gainful employment (AR 401). He concluded that her disability was "mostly due to her psychological issues, although her cerebral palsy and physical limitations "play[ed] a part as well" (AR 401).

### B. *Medical evidence submitted to the Appeals Council*

On November 5, 2009, Plaintiff was seen at Seneca and denied any symptoms of anxiety or depression and reported that Prozac was "working well" (AR 460). She was assessed with a mood disorder, insomnia and anxiety, and it was noted that she seemed to be responding well to her medication (AR 461).

Plaintiff underwent a Functional Capacity Evaluation on November 12, 2009 upon referral from Dr. Santee (AR 463-465). Darla K. Pasikoski, OTR/L, noted that Plaintiff was "very vocal" about not wanting to perform the test and made negative comments throughout testing (AR 464). She was able to lift eighteen pounds, push 200 pounds on a wheeled cart with fairly good control, and complete crawling, squatting, and kneeling activities (AR 464). She had difficulty maintaining her balance (AR 464). Plaintiff refused to lift additional weight, and Ms. Pasikoski noted that Plaintiff appeared to perform with limited effort, but her blood pressure and symptomology did elevate as her reports of pain elevated (AR 464). Plaintiff had difficulty with direction during activities and became easily frustrated (AR 464).

Ms. Pasikoski opined that Plaintiff demonstrated a limited ability to complete an eight hour work day (AR 464). It was recommended that Plaintiff complete activities while alternating between sitting and standing, with frequent rest breaks, an ergonomic work station

and minimal lifting (AR 464). Ms. Pasikoski had "[c]oncerns with patient's frustration and inability to follow directions during activities" (AR 464).[5]

   C. *Hearing testimony*

Plaintiff and Dr. Reed, a vocational expert, testified at the hearing held by the ALJ on December 19, 2008 (AR 23-50). Plaintiff testified that she was single and lived with her parents and two minor nephews (AR 28;39). She wore a half inch lift in her left shoe, but did not use a cane, walker or brace (AR 29). Plaintiff stated that she had been treated at Paoletta for approximately three years prior to the hearing, except for the period she lost her medical access card (AR 29). She saw a therapist every two to three weeks, but had never seen a doctor (AR 29-30). She claimed that Prozac had not helped her, and at the time of the hearing, she was taking no medications for her mental impairments (AR 30-31).

Plaintiff testified that she had difficulty dealing with stress on a daily basis (AR 33). She claimed it caused her to isolate herself, pull her hair out, and interfered with her ability to concentrate (AR 33-34). Plaintiff further testified that she had difficulty interacting with others and would "flip[] out" on people (AR 36-37). She indicated that she had been fired from several jobs for yelling at coworkers and had difficulty working the cash register due to her deficient math skills (AR 41-42; 44). Plaintiff stated that her symptoms had worsened over time (AR 37-38). She indicated that her home life was stressful, in that she fought with her mother on a daily basis and her father complained about her performance of the household chores (AR 38-39). Plaintiff claimed, however, that her performance was up to a "normal person's standard" (AR 39; 46). Plaintiff testified that she had no social life, but talked on the phone once a week with a friend and occasionally visited the library (AR 46).

The vocational expert was asked to assume an individual of the same age, education and work experience as Plaintiff, who was limited to light work that was simple and repetitive in

---

[5] Plaintiff also submitted an x-ray of her thoracic/lumbar spine dated September 14, 2007 which showed a scoliotic curvature measuring twenty five degrees and evidence of a 10mm leg length discrepancy (AR 447), and a letter authored by Carni Hrisak, MSSA, LSW from Hand in Hand Christian Counseling, who reported that she had seen Plaintiff for a session on "August 14th" (AR 449). Plaintiff does not however, argue that these reports require a remand.

11

nature, involving routine work processes and settings, not involving team work or interaction with the public (AR 47). Such individual would further be unable to engage in high stress work, defined as work involving high quotas or close attention to quality production standards (AR 47). The vocational expert testified that such an individual could work as a housekeeper, run a photocopier, or be a stock/inventory clerk (AR 48).

Following the hearing, the ALJ issued a written decision which found that Plaintiff was not entitled to a period of disability or DIB within the meaning of the Act (AR 11-22). Her request for an appeal with the Appeals Council was denied rendering the ALJ's decision the final decision of the Commissioner (AR 1-6). She subsequently filed this action.

### III. STANDARD OF REVIEW

The Court must affirm the determination of the Commissioner unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence does not mean a large or considerable amount of evidence, but only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood,* 487 U.S. 552, 564-65 (1988) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 1097, 229 (1938)); *see also Richardson v. Parales*, 402 U.S. 389, 401 (1971); *Ventura v. Shalala*, 55 F.3d 900, 901 (3rd Cir. 1995). It has been defined as less than a preponderance of evidence but more than a mere scintilla. *See Richardson*, 402 U.S. at 401; *Jesurum v. Secretary of the United States Dept. of Health and Human Servs.*, 48 F.3d 114, 117 (3rd Cir. 1995). Additionally, if the ALJ's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson*, 402 U.S. at 390. A district court cannot conduct a *de novo* review of the Commissioner's decision or re-weigh evidence of record. *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D.Pa. 1998); *see also Monsour Medical Center v. Heckler*, 806 F.2d 1185, 90-91 (3rd Cir. 1986) ("even where this court acting *de novo* might have reached a different conclusion … so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings."). To determine whether a finding is supported by substantial evidence, however, the district court must review the record as a whole. *See* 5 U.S.C. § 706.

## IV.     DISCUSSION

Title II of the Social Security Act provides for the payment of disability insurance benefits to those who have contributed to the program and who have become so disabled that they are unable to engage in any substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). Title XVI of the Act establishes that SSI benefits are payable to those individuals who are similarly disabled and whose income and resources fall below designated levels. 42 U.S.C. § 1382(a). A person who does not have insured status under Title II may nevertheless receive benefits under Title XVI. *Compare* 42 U.S.C. § 423(a)(1) *with* 42 U.S.C. § 1382(a). In order to be entitled to DIB under Title II, a claimant must additionally establish that her disability existed before the expiration of her insured status. 42 U.S.C. § 423(a), (c). The ALJ found that Plaintiff met the disability insured status requirements of the Act through June 30, 2008 (AR 11). SSI does not have an insured status requirement.

A person is "disabled" within the meaning of the Social Security Act if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner uses a five-step evaluation process to determine when an individual meets this definition:

> In the first two steps, the claimant must establish (1) that he is not engaged in "substantial gainful activity" and (2) that he suffers from a severe medical impairment. *Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987). If the claimant shows a severe medical impairment, the [Commissioner] determines (3) whether the impairment is equivalent to an impairment listed by the [Commissioner] as creating a presumption of disability. *Bowen*, 482 U.S. at 141. If it is not, the claimant bears the burden of showing (4) that the impairment prevents him from performing the work that he has performed in the past. Id. If the claimant satisfies this burden, the [Commissioner] must grant the claimant benefits unless the [Commissioner] can demonstrate (5) that there are jobs in the national economy that the claimant can perform. *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3rd Cir. 1985).

*Jesurum*, 48 F.3d at 117.  The ALJ concluded that Plaintiff had the following severe impairments: scoliosis, cerebral palsy and depressive disorder, but determined at step three that she did not meet a listing (AR 13-15).  The ALJ found that she was able to perform work at the light exertional level, except she would be limited to work activity that was simple and repetitive in nature involving routine work processes and settings, and not involving high stress, teamwork or any interaction with the public (AR 15).  At the final step, the ALJ concluded that Plaintiff could perform the jobs cited by the vocational expert at the administrative hearing (AR 21).  The ALJ also determined that Plaintiff's statements concerning the intensity, persistence and limiting effects of her symptoms were not entirely credible (AR 16).  Again, I must affirm this determination unless it is not supported by substantial evidence.  *See* 42 U.S.C. § 405(g).

       As an initial matter, I must determine whether the evidence submitted to the Appeals Council, but not considered by the ALJ, dictates a remand.  As detailed above, this evidence consists of Seneca treatment notes dated November 5, 2009 (AR 460) and a Functional Capacity Evaluation dated November 12, 2009 (AR 463-465).  When a claimant seeks to rely on evidence that was not before the ALJ, the district may remand the case to the Commissioner if three requirements are met.  *Matthews v. Apfel*, 239 F.3d 589, 593 (3rd Cir. 2001).  First, the evidence must be "new," in the sense that it is not cumulative of pre-existing evidence on the record.  *Szuback v. Sec. of Health and Human Servs.*, 745 F.2d 831, 833 (3rd Cir. 1984).  Second, new evidence must also be "material," meaning that it is "relevant and probative" and there is a reasonable possibility that the new evidence would have changed the outcome of the ALJ's decision.  *Id*.  Moreover, implicit in the materiality requirement is that the new evidence "relate to the time period for which benefits were denied, and that it not concern evidence of a later-acquired disability or of the subsequent deterioration of the previously non-disabling condition."  *Id*.  Finally, "good cause" must be shown for not submitting the evidence at an earlier time.  *Id*.

       Plaintiff has failed to demonstrate a new evidence remand is warranted.  While the evidence submitted by Plaintiff is "new" in the sense that it was not generated until after the decision of the ALJ dated June 5, 2009, these records are immaterial since they do not relate to the time period for which benefits were denied.  *See e.g., Harkins v. Astrue*, 2011 WL 778403 at

*1 n.1 (W.D.Pa. 2011) (holding that a new evidence remand was not warranted where records dated one month after ALJ's decision did not expressly relate back to the relevant period); *Range v. Astrue*, 2009 WL 3448746 at *8 (W.D.Pa. 2009) (records that post-date the ALJ's decision are immaterial since they do not relate to the time period for which benefits were denied); *Anderson v. Comm'r of Soc. Sec.*, 2008 WL 619209 at *12 (D.N.J. 2008) (claimant not entitled to remand where records were dated after ALJ's decision); *Wilson v. Halter*, 2001 WL 410542 (E.D.Pa. 2001) (medical reports relating to period of time after that addressed in the hearing are immaterial to the ALJ's decision and therefore do not warrant remand), *aff'd*, 27 Fed. Appx. 136 (3rd Cir. 2002). Accordingly, I direct my attention to Plaintiff's arguments relative to the evidence that was before the ALJ.

Plaintiff first argues that the ALJ erred in rejecting the opinion of her treating physician, Dr. Fell. "A cardinal principle guiding disability determinations is that the ALJ accord treating physicians' reports great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a long period of time.'" *Morales v. Apfel*, 225 F.3d 310, 317 (3rd Cir. 2000) (quoting *Plummer v. Apfel*, 186 F.3d 422, 429 (3rd Cir. 1999)) (citations omitted); *see also Adorno v. Shalala*, 40 F.3d 43, 47 (3rd Cir. 1994). In choosing to reject a treating physician's opinion, an ALJ may not make "speculative inferences from medical reports" and may reject "a treating physician's opinion outright only on the basis of contradictory medical evidence" and not due to his own credibility judgments, speculation or lay opinion. *Plummer*, 186 F.3d at 429; *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3rd Cir. 1988) (holding that "the medical judgment of a treating physician can be rejected only on the basis of contradictory medical evidence" not "simply by having the administrative law judge make a different judgment"); *Moffat v. Astrue*, 2010 WL 3896444 at *6 (W.D.Pa. 2010) ("It is axiomatic that the Commissioner cannot reject the opinion of a treating physician without specifically referring to contradictory medical evidence."). In addition, a treating source's medical opinion concerning the nature and severity of the claimant's alleged impairments will be given controlling weight if the Commissioner finds that the treating source's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not

15

inconsistent with the other substantial evidence" in the record. 20 C.F.R. §§ 404.1527(d)(2); 416.927(d)(2). Finally, where an ALJ chooses to reject the opinion of a treating physician, he must adequately explain in the record his reason for doing so. *See Sykes v. Apfel*, 228 F.3d 259, 266 (3rd Cir. 2000) ("Where the Secretary is faced with conflicting evidence, he must adequately explain in the record his reasons for rejecting or discrediting competent evidence.").

Dr. Fell opined that Plaintiff was permanently disabled from any gainful employment mostly due to her psychological issues, although he found that her cerebral palsy and physical limitations "play[ed] a part as well" (AR 401). In assigning this opinion "little weight," the ALJ stated:

> In this case, Dr. Fell is an examining physician and his opinion would ordinarily be entitled to great weight. However, Dr. Fell's opinion is inconsistent with the claimant's treating records which indicate that the claimant's mood was stable. Moreover, a conclusion of disability is inconsistent with the claimant not being prescribed any medication. Thus, the opinion of Dr. Fell is given little weight because it is not supported by the evidence and is not consistent with the record as a whole … .

(AR 19).

Plaintiff argues that the ALJ's finding that her mood disorder was stable was based upon a selective review of the records. The Third Circuit has directed that "[w]here competent evidence supports a claimant's claims, the ALJ must explicitly weigh the evidence," *Dobrowolsky v. Califano*, 606 F.2 403, 407 (3rd Cir. 1979), and, as previously stated, "adequately explain in the record his reasons for rejecting or discrediting competent evidence." *Sykes*, 228 F.3d at 266. Without this type of explanation, "the reviewing court cannot tell if significant probative evidence was not credited or simply ignored." *Cotter v. Harris*, 642 F.2d 700, 705-07 (3rd Cir. 1981); *see also Plummer*, 186 F.3d at 429 (ALJ must give some reason for discounting the evidence he rejects).

I find that the ALJ failed to adequately address all pertinent medical evidence in his evaluation of Dr. Fell's opinion. There are treatment notes that are indicative of periodic mood instability. For example, when seen at Paoletta on August 2, 2007, her mood was reported as mildly manic and anxious, and she displayed circumstantial thought and exhibited flight of ideas

16

(AR 268). The examiner noted that she went "on and on about Batman and cars" and rapidly changed subjects (AR 268). The examiner found that her insight was "impaired" and assessed her with a GAF score of 40, which indicates some impairment in reality testing or communication, or "major impairment" in several areas, such as work, family relations, judgment, thinking or mood. *See Diagnostic and Statistical Manual of Mental Disorders: DSM-IV-TR* 34 (4th ed. 2000). In September 2007, it was noted that Plaintiff seemed "more upset than would be expected" about her work shift (AR 294). On October 17, 2007, Plaintiff was very tearful and agitated, and was assessed with mood swings (AR 292). At her office visit in January 2008, it was reported that she displayed anxiety throughout the exam (AR 398). On July 24, 2008, Dr. Fell noted that Plaintiff rambled in conversation and needed constant redirection, and commented that her unique personality issues might complicate her employment opportunities (AR 393). On remand the ALJ should address the aforementioned evidence as required by *Cotter*.

Plaintiff next claims the ALJ erred in assigning the opinion of Dr. Fernan, the consulting examiner, little weight. An ALJ must consider the extent to which a consulting examiner's opinion is supported by a logical explanation, the degree of the medical source's specialization in a relevant field, and the extent to which the source's opinion is consistent with the entirety of the evidence. *See generally* 20 C.F.R. §§ 404.1527(d)(1)-(6); 416.927(d)(1)-(6). The ALJ stated the following with respect to Dr. Fernan's opinion:

> Dr. Fernan determined that the claimant has marked limitation in her ability to carry out short, simple instructions; carry out detailed instructions, and interact appropriately with the public, supervisors and coworkers. Dr. Fernan further determined that the claimant has extreme limitation in her ability to respond appropriately to work pressures in a usual work setting and respond appropriately to changes in a routine work setting (Exhibit 16F). Dr. Fernan examined the claimant. His opinion is inconsistent with the claimant's self report. For example, the claimant reported that she has no problem following written instructions and can pay attention as long as needed. This contradicts Dr. Fernan's conclusion that the claimant has marked limitation in her ability to carry out short, simple instructions. Thus, the opinion of Dr. Fernan is given little weight because it is not supported by the evidence and is not consistent with the record as a whole … .

(AR 19). Similar to the ALJ's evaluation of Dr. Fell's opinion, the ALJ failed to address other findings of Dr. Fernan that are material to a determination of disability. In addition to the findings enumerated by the ALJ, Dr. Fernan found that Plaintiff had "great difficulty" answering questions in a goal-directed manner, had poor impulse control, easily became verbally aggressive, and had "very poor" social judgment (AR 382; 385). Objective personality testing revealed that Plaintiff's personality pattern indicated she was significantly withdrawn, felt alienated, suffered from significant anxiety and debilitating depression (AR 382). Dr. Fernan found that she harbored anger and resentment, and would behave in a "very immature, impulsive and aggressive manner" (AR 382). He stated she was significantly withdrawn and had great difficulty refraining from focusing on her physical problems (AR 385). Dr. Fernan concluded that her somatic difficulties would be exacerbated by stress and would be difficult to control (AR 385). While the ALJ is not required to discuss every finding in every treatment note, *see Fargnoli v. Massanari*, 247 F.3d 34, 42 (3rd Cir. 2001), given the potential materiality of these findings, the ALJ is specifically directed to address this evidence on remand.

Finally, Plaintiff claims that the ALJ's hypothetical question did not include all her functional limitations. Testimony of a vocational expert concerning a claimant's ability to perform alternative employment may only be considered for purposes of determining disability if the hypothetical question accurately portrays the claimant's individual physical and/or mental impairments. *See Podedworny v. Harris*, 745 F.2d 210, 218 (3rd Cir. 1984). An ALJ is therefore only required to accept such testimony if such limitations are supported by the record. *See Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3rd Cir. 1987). Since the matter will be remanded, the ALJ will necessarily re-evaluate Plaintiff's functional limitations following his consideration of all the medical evidence.[6]

---

[6] Plaintiff also contends that the ALJ failed to consider the combined effect of her impairments in determining whether they met and/or equaled the requirements of one of the listed impairments. *See e.g., Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 119 (3rd Cir. 2000). Given my conclusion that the ALJ's evaluation of the medical evidence with respect to Plaintiff's mental impairments was inadequate, on remand he should revisit his step three finding after reconsideration of all the evidence of record.

## V.     CONCLUSION

For the reasons discussed above, the Defendant's Motion will be denied and the Plaintiff's Motion will be granted only to the extent she seeks a remand for further consideration. The matter will be remanded to the Commissioner for further proceedings consistent with this Memorandum Opinion.[7] An appropriate Order follows.

---

[7] The ALJ is directed to reopen the record and allow the parties to be heard via submissions or otherwise as to the issues addressed in this Memorandum Opinion. *See Thomas v. Comm'r of Soc. Sec.*, 625 F.3d 800-01 (3rd Cir. 2010).

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

KITTY LOUISE HOFFMAN, )
)
    Plaintiff, )    Civil Action No. 10-167 Erie
)
v. )
)
MICHAEL J. ASTRUE, )
Commissioner of Social Security, )
)
    Defendant. )

## ORDER

AND NOW, this 27th day of July, 2011, and for the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment [ECF No. 8] is DENIED, and Plaintiff's Motion for Summary Judgment [ECF. No. 6] is GRANTED to the extent she seeks a remand for further consideration by the Commissioner. The case is hereby REMANDED to the Commissioner of Social Security for further proceedings consistent with the accompanying Memorandum Opinion.

The clerk is directed to mark the case closed.

                              s/ Sean J. McLaughlin
                              United States District Judge

cm:    All parties of record